# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

04 APR -6 AM 8: 35

U.S. DISTRICT COURT
N D OF ALABAMA

| | | |
|---|---|---|
| BRENN DAVIS, | } | |
| | } | |
| Plaintiff, | } | |
| | } | |
| v. | } | Case No.: CV 02-P-1156-S |
| | } | |
| JO ANNE B. BARNHART, | } | **ENTERED** |
| | } | |
| Defendant. | } | APR - 6 2004 |

## MEMORANDUM OPINION

The court has before it Defendant's Motion for Summary Judgment (Doc. # 32) filed May 2, 2003 and Defendant's Motion to Strike Affidavits (Doc. # 49) filed June 18, 2003. The court heard oral argument on the motions on March 17, 2004. For the reasons outlined below, Defendant's Motion for Summary Judgment is due to be granted because there are no disputed issues of material fact and Defendant has demonstrated that she is entitled to judgment as a matter of law. Defendant's Motion to Strike Affidavits is due to be granted in part and denied in part.

## I.   Procedural History

Plaintiff Brenn Davis commenced this action on May 5, 2002 by filing a complaint in this court alleging that the Social Security Administration ("SSA") discriminated against her on the basis of race, white, by selecting an African-American candidate for the position of Birmingham Mega-Teleservice Center Director "in spite of the Plaintiff's superior qualifications" and retaliated against her for filing a complaint of race discrimination with the SSA office of the Equal Employment Opportunity Commission. (Doc. # 1). Plaintiff contends that Defendant's alleged conduct violates Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*. (Doc. # 1). Defendant's motion for summary judgment asserts that no genuine issue of material fact exists and that Defendant



is entitled to judgment as a matter of law. (Doc. # 32).

The parties have each filed briefs and submitted evidence in support of their respective positions concerning the pending motion for summary judgment. On May 2, 2003, Defendant filed a memorandum of law in support of her motion, (Doc. # 33), and evidentiary submission. (Doc. # 34). On June 11, 2003, Plaintiff submitted a memorandum of law (Doc. # 47)[1] and evidentiary submission. (Doc. # 46). Defendant filed a Motion to Strike Affidavits (Doc. # 49) and reply brief (Doc. # 50) on June 18, 2003. Plaintiff filed an opposition to the motion to strike (Doc. # 51) on June 27, 2003. Additionally, the court granted Plaintiff leave to supplement her opposition to the motion for summary judgment on two occasions, (Docs. # 67, 74), and Plaintiff filed additional briefs and evidence on September 15, 2003 (Doc. # 57) and March 16, 2004 (Doc. # 73).

## II.     Legal Standards for Evaluating a Summary Judgment Motion

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *See id.* at 323. Once the moving party has met her burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific

---

[1] Although Plaintiff originally filed a brief on June 3, 2003, (Docs. # 41, 42), the court allowed plaintiff to file an amended and substituted response approximately one week later. (Doc. # 45).

facts showing that there is a genuine issue for trial. *See id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* 249.

The method used by the party moving for summary judgment to discharge her initial burden depends on whether that party bears the burden of proof on the issue at trial. *See Fitzpatrick*, 2 F.3d at 1115-17 (citing *United States v. Four Parcels of Real Property*, 941 F.2d 1428 (11th Cir. 1991) (en banc)). If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; i.e. facts that would entitle it to a directed verdict if not controverted at trial. *See Fitzpatrick*, 2 F.3d at 1115. Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, she can satisfy her initial burden on summary judgment in either of two ways. First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial. Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial. The second method by which the moving party who does not bear the burden of proof at trial can

3

satisfy her initial burden on summary judgment is to *affirmatively* show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question. This method requires more than a simple statement that the non-moving party cannot meet her burden at trial but does not require evidence negating the non-movant's claim; it simply requires that the movant point out to the district court that there is an absence of evidence to support the non-moving party's case. *See Fitzpatrick*, 2 F.3d at 1115-16. If the movant meets her initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts. *See Lewis v. Casey*, 518 U.S. 343, 358 (1996) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)). The Court is aware that the summary judgment rule applies in job discrimination cases just as in other cases. *Chapman v. AI Transport*, 229 F.3d 1012, 1025 (11th Cir. 2000) (rejecting an earlier, contrary general rule and emphasizing that no thumb is to be placed on either side of the scale).

## III.   Relevant Undisputed Facts[2]

### A.   Plaintiff's Position as Director of the Birmingham Mega-TSC

SSA utilizes units called "Tele-Service Centers" ("TSC's") to handle "800 number" calls from citizens inquiring about benefits or entitlements in the Social Security program.  (Doc. # 34, DEX 5, Colvin depo., at 81; DEX 3, McClure depo., at 196; DEX 4, Davis Depo., at 29). The largest TSCs

---

[2] If facts are in dispute, they are stated in the manner most favorable to the Plaintiff. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).

are referred to as "Mega TSCs." (Doc. # 34, DEX 3, McClure depo., at 21).  Nationwide, there are four Mega TSCs located in Birmingham, Alabama; Baltimore, Maryland; Albuquerque, New Mexico; and Auburn, Washington. (Doc. # 34, DEX 4, Davis depo., at 46). In the Atlanta region, there are three TSCs--the Birmingham Mega TSC, and two other, smaller TSCs located in Fort Lauderdale and Tampa, Florida. (Doc. # 34, DEX 3, McClure depo., at 20-21).

Plaintiff, a white female, has been employed by SSA in Birmingham for thirty-five years. (Doc. # 1, at 3).  In January 1999, Plaintiff was selected as the Director of the Mega-TSC in Birmingham ("Director"), earning the federal job classification of GS-14. (Doc. # 1, at 3). Nationwide, SSA employed four Mega TSC Directors with responsibility over their respective TSC operations.  (Doc. # 1, at 3).  As Director, Plaintiff was responsible for overall management and operation of approximately 500 personnel (Doc. # 1, at 3), although Plaintiff was not responsible for supervising the smaller Ft. Lauderdale or Tampa TSCs. (Doc. # 34, DEX 4, Davis depo., at 46).

**B.    Reclassification and Selection of GS-15 Mega-TSC Director Position**

In or about August 2000, SSA restructured nationwide and reclassified all four Mega-TSC Director positions from GS-14 to GS-15.  (Doc. # 1, at 3).[3]  SSA internally advertised the four

---

[3] Defendant maintains that the restructuring essentially created four new positions. (Doc. # 34, DEX 3, McClure depo., at 20-27; DEX 2, Habersham depo., at 22-29; DEX 4, Davis depo. at 46-47).  Plaintiff disagrees that "new" positions were "created" and maintains that the grade reclassification did *not* substantially change the job duties of the Mega-TSC Director. This semantic dispute is not material to Plaintiff's claim that SSA discriminated against her by conspiring to hire an African-American into management. First, SSA was not obligated to implement new job duties for the reclassified GS-15 Mega-TSC Director *immediately* upon reclassification of the position. Nonetheless, Plaintiff admits that the restructuring resulted in *some* changes to the Birmingham Mega-TSC Director position. Plaintiff admits that when she was the GS-14 Birmingham Mega-TSC Director prior to the reorganization, she had no supervisory authority over either the Ft. Lauderdale or Tampa TSCs. (Doc. # 34, DEX 4, Davis depo., at 46). Upon reclassification of the position to GS-15, the Birmingham Mega TSC Director took over responsibility for running the Tampa and Ft. Lauderdale TSCs, which have about 200 employees, and for the 800 number. (Doc. # 46, PEX 4,

promotion opportunities. (Doc. # 1, at 3). Out of the pool of applicants for the four positions, SSA's

national personnel office created a "Best Qualified List" ("BQL") of applicants, divided out for each

of the four positions.  (Doc. # 34, DEX 2, Habersham depo., at  65-66, 86).

   Myrtle Habersham, Atlanta Regional Commissioner and a black female, was responsible for

recommending a candidate for the Birmingham position to Carolyn W. Colvin, who was at that time

Deputy Commissioner for Operations and also a black female.  (Doc. # 1, at 3-4).  Colvin, the

selecting official for all four positions nationwide, received a copy of the BQL of candidates for each

of the four positions along with their submitted applications. (Doc. # 34, DEX 2, Habersham depo.,

at  65-66, 86).  Colvin did not personally know the applicants for the positions; instead, she made

her selections for each of the four nationwide GS-15 positions based on the recommendations she

received from the Regional Commissioners for each of the four regions involved. (Doc. # 34, DEX

5, Colvin depo., at 59-60, 64; DEX 2, Habersham depo., at87; DEX 3, McClure depo., at 78-80;

Complaint,¶ 25).  Colvin's primary role in the process was to have her executive officer "make sure

that all of the proper personnel procedures [were] in place." (Doc. # 34, DEX 5, Colvin depo., at

59).[4]

_____

Carter Affidavit, at 2; Doc. # 34, DEX 7, Washington depo., at 33-35, 42, 45; Doc. # 34, DEX 3, McClure depo., at 38-43).  The degree of change in job duties is not material to this case.

   [4] Plaintiff claims Colvin played a greater role in the selection process than the record indicates and that "[t]here is a hidden Agency agenda to diversify more quickly at high level management levels." (Doc. # 47, at 6).  Plaintiff points to the fact that Colvin's office submitted a request for the BQL for the Birmingham Director position and that the pre-printed request form included a block checked "Minority Statistics Requested." (Doc. # 34, DEX 1, AR at E-26).  Colvin testified she was not aware of the request for those statistics and did not review any such statistics. (Doc. # 34, DEX 5, Colvin depo. at 51-58). Habersham also testified that she did not request those statistics, did not receive or review any such statistics, and did not consider race when making her recommendation to Colvin. (Doc. # 34, DEX 2, Habersham depo., at 413).  Plaintiff offers no evidence, other than conspiracy theories based on the unclaimed request for minority statistics, to

Plaintiff applied for the Birmingham Mega-TSC Director GS-15 position and was listed on the BQL for the Birmingham position, along with eleven other employees. (Doc. # 1, at 3). Of the twelve BQL candidates, nine were white and three were black. (Doc. # 1, at 5). All twelve candidates were interviewed by a three-person panel over the telephone. (Doc. # 34, DEX 2, Habersham depo., at 87-89; DEX 3, McClure depo., at148; DEX 6, Wilson depo., at 29). The panel of interviewers consisted of Habersham; William McClure, the Atlanta Deputy Regional Commissioner and a white male; and Quittie Wilson, the Assistant Regional Commissioner for the Birmingham Processing Service Center and a black male. (Doc. # 1, at 4). At the time of the interview, both McClure and Wilson reported to Habersham. (Doc. # 1, at 4).

Ultimately, Habersham recommended Dianne Washington, one of the BQL candidates and a black female, for the Birmingham Mega-TSC Director position. (Doc. # 1, at 4).[5] Plaintiff failed to rank in the top three candidates for the position. (Doc. # 1, at 4). Colvin adopted Habersham's recommendation and Washington was selected for the position. (Doc. # 1, at 4).

After learning she was not selected for the Birmingham Mega-TSC Director, Plaintiff applied for, and was selected as, the Birmingham Deputy Mega-TSC Director, a position created as part of the restructuring. (Doc. # 1, at 4). As deputy, Plaintiff reports to Director Washington, although

---

suggest Colvin conducted any independent analysis of the candidates or considered race when making her decision. Regardless, the court need not decide how involved Colvin was in the selection process given that it is undisputed that Colvin requested Habersham to recommend a selectee and did not deviate from Habersham's recommendation of the successful candidate.

[5] Habersham and McClure each testified they felt Washington was the top candidate, and McClure states he advised Habersham of his recommendation. (Doc. # 34, DEX 2, Habersham depo., at 108). Wilson, however, denied he made a specific recommendation to Habersham for any specific candidate, but admitted that he thought highly of both the Plaintiff and Washington and thought "general management skills would be the overarching requirement." (Doc. # 34, DEX 6, Wilson depo., at 78-79, 185-86).

Plaintiff still has some supervisory responsibilities over the Birmingham Mega TSC and its 500 employees. (Doc. # 46, PEX 7, Agency's Response to Plaintiff's Request for Admissions, ¶ 38; Doc. # 34, DEX 4, Davis depo., at 6-28; Doc. # 46, PEX 4, Carter Affidavit, at 2; Doc. # 34, DEX 7, Washington depo., at 33-35, 42, 46- 48, 51-52 ; Doc. # 46, PEX 7, Agency's Response to Plaintiff's Request for Admissions, ¶ 38).

**C.   Relative Qualifications of Plaintiff and Washington**[6]

Plaintiff claims that she was "clearly better qualified" than Washington for the Birmingham GS-15 position. (Doc. # 1, at 4). Plaintiff points to her two years of sucessful experience in the GS-14 position, her "numerous awards and accolades . . . many of them in the performance of the Birmingham Mega TSC Director position," and her continuing performance of many of the Director's responsibilities even after Washington assumed the position. (Doc. # 1, at 4).

Plaintiff began working for the Agency in 1971 and had been a TSC employee since 1988. (Doc. # 34, DEX 4, Davis depo., at 40-42). She has been a GS-14 level supervisor since January 1999, when she became Director of the Birmingham TSC. (*Id.*) During her employment at the Agency, she has won several awards. (Doc. # 34, DEX 1, AR at E-22). The Birmingham Mega TSC office was rated highly during the time Plaintiff served as Director. (Doc. # 34, DEX 3, McClure depo., at 155).

The selectee, Dianne Washington, has also worked for the Agency since 1971. (Doc. # 34, DEX 7, Washington depo., at 9). Prior to the selection at issue, she had approximately 26 years of supervisory experience with the Agency, (*Id.*, at 82), and had been a GS-14 level Operations Support

---

[6] The applications submitted by the Plaintiff and selectee, Dianne Washington, for the position at issue can be found in the Administrative Record at E-22 and E-23, respectively. (Doc. # 34, DEX 1, AR at E-22 and E-23).

8

Branch manager in the Program Service Center ("PSC") branch since 1990. (*Id.,* at 13-14). Washington had not specifically worked in the TSC prior to the selection at issue, but she had been the "backup 800 coordinator" for a number of years and had responsibility for overseeing some of the 800 number functions for the PSC and the TSCs. (*Id.* at 14-17, 25, 26).[7] Washington had also received numerous awards from the Agency. (Doc. # 34, DEX 1, AR at E-23).

### D.    Plaintiff's Allegations

Plaintiff filed an administrative complaint of discrimination on January 22, 2001, alleging race discrimination in the selection of the GS-15 position. (Doc. # 34, DEX 1, AR, Report of Investigation, at Tabs A-C). She also complained that two white managers were selected for positions in other regions without being interviewed, but that "she had to be interviewed and was not promoted." (*Id.,* at Tab B).   Plaintiff filed this action in this court after more than 180 days passed from the filing of her administrative complaint without a final agency decision. (Doc. # 1).

Plaintiff's judicial complaint alleges that SSA's selection process for the four Mega TSC Director positions nationwide was "corrupted in order to ensure the selection of at least one Black for one of the four positions [nationwide]." (Doc. # 1, at 5).   Plaintiff points to the selection of two "white incumbents," who were not interviewed prior to selection, for two of the reclassified Director positions in other regions.   (Doc. # 1, at 5).   Plaintiff claims that Habersham and Colvin "have followed a pattern and practice of favoring the replacement of senior White personnnel in the regional office staff with Black personnel when opportunities arose." (Doc. # 1, at 5).

---

[7]During the time Washington was Operations Support Branch Manager in the PSC, she had responsibility for the "debt management section" where she supervised between 75 and 100 employees whose responsibilities included handling 800 number calls. *(Id.,* at 30).

9

IV.    **Defendant's Motion to Strike**

Defendant has moved to strike five affidavits (Doc. # 46, Exs. 1-5) and the expert report (Doc. # 46, Ex. 6) submitted by Plaintiff in opposition to the motion for summary judgment. (Doc. # 49). With respect to the affidavit evidence, Defendant argues generally that three of the five affiants (Fabricio Barerra, Deborah Vess, and Thomas Leahy) were never identified as witnesses by Plaintiff in her initial disclosures or interrogatory responses and that the testimony offered by the affiants is not relevant to the issues in this case. Defendant's relevancy argument hinges on the fact that, with the exception of Leahy, none of the affiants were working for SSA at the time of the October 2000 selection about which Plaintiff complains. (Doc. # 49). Defendant also objects to specific portions of each affidavit, arguing those sections should be stricken as inadmissible conclusory statements, contradictory statements, or hearsay. (Doc. # 49). Plaintiff generally responds that the evidence tends to show a "pattern and practice" of discrimination and establishes the "discriminatory atmosphere" created by Habersham. (Doc. # 51).

It appears to the court that, in an effort to adduce circumstantial evidence, plaintiff has elected to make a quantity submission of evidence rather than a quality submission. However, viewing the affidavits in the light most favorable to the Plaintiffs and treating the affidavits collectively and "indulgently," the court finds that Defendant's motion to strike is due to be denied as it relates to the five affidavits. *James Talcott, Inc. v. Allahabad Bank, Limited,* 444 F.2d 451, 457 (5th Cir. 1971). Nonetheless, the court finds that, whether it considers this evidence independently or as a whole, the affidavits are simply not sufficient to establish that the Defendant's legitimate reasons for the selection in question are pretextual. Rather than restate what Defendant has set forth in her brief supporting her motion to strike regarding the weaknesses of this evidence, the court

10

adopts the portions of Defendant's brief addressing the same. (*See* Doc. # 49).

As to the report submitted by Plaintiff's purported expert, Dr. Theodore Bos, the Defendant argues it should be excluded because it contains "voodoo statistics" that are not probative. (Doc. # 49). Plaintiff maintains that the report is properly considered because Defendant has not proffered a counter-expert to challenge the findings of Dr. Bos. Even without the benefit of a counter-expert, however, it is clear to the court that Dr. Bos based his opinions on general statistics compiled from nationwide selections, which were not limited to selections in which Habersham was the recommending official. Moreover, the report is based on incomplete data (*e.g.* the race of some selectees was not available for some of the selections) and utilized no control for factors such as relative qualifications of the applicants and other non-race considerations which may have influenced the selections made.

As the Supreme Court explained in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), "[when] faced with a proffer of expert scientific testimony, [] the trial judge must determine at the outset, pursuant to Rule 104(a)[8], whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue.[] This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592-593. In determining admissibility, "the

---

[8] "'Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court, subject to the provisions of subdivision (b) [pertaining to conditional admissions]. In making its determination it is not bound by the rules of evidence except those with respect to privileges.' These matters should be established by a preponderance of proof. *See Bourjaily v. United States*, 483 U.S. 171, 175-176, 107 S.Ct. 2775, 2778-2779, 97 L.Ed.2d 144 (1987)."

court ordinarily should consider the known or potential rate of error . . . and the existence or maintenance of standards controlling the technique's operation." *Daubert*, 509 U.S. at 593. Given that Dr. Bos's report is based on generalized, incomplete data and lacked controls for non-race considerations that may have influenced the selections analyzed, the court finds that Dr. Bos's report is inadmissible under Fed. R. Civ. P. 702 because it is not based on reliable methodology and because it lacks the existence and maintenance of standards controlling the technique's operation. *See Daubert*, 509 U.S. at 593. Therefore, Defendant's motion to strike is due to be granted as it relates to Plaintiff's expert report (Doc. # 46, Ex. 6).

Having determined what evidence is properly before the court on the summary judgment motion, the court will now turn to Plaintiff's claims.

## V.      Applicable Substantive Law and Discussion

The analysis of the Plaintiff's claims will be determined not only by the nature of the allegations but also by the quality of the evidence offered in support of those claims. *Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998) (noting that "[t]he analytical framework and burden of production var[y] depending on the method of proof chosen"). In general, a plaintiff may attempt to establish a claim of illegal employment discrimination through the use of direct evidence, circumstantial (indirect) evidence, or statistics. *Id.; see also Schoenfeld v. Babbitt*, 168 F.3d 1257, 1266 (11th Cir. 1999) (recognizing the availability of either direct or circumstantial evidence). A plaintiff's ability to proceed through the use of circumstantial evidence of discrimination is necessarily important because direct proof of discrimination is uncommon. *Combs v. Plantation Patterns*, 106 F.3d 1519, 1537 (11th Cir. 1997); *Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 595 (11th Cir. 1987). Direct evidence is "[s]uch evidence [which], if believed, proves the

existence of a fact in issue without inference or presumption." *Burns v. Gadsden State Community College*, 908 F.2d 1512 (11th Cir. 1990). *Cf. Wright v. Southland Corp.*, 187 F.3d 1287, 1293-94 (11th Cir. 1999) (per Tjoflat, J.) (defining direct evidence as "evidence from which a reasonable trier of fact could find, more probably than not, a causal link between an adverse employment action and a protected personal characteristic" and finding the outcomes reflected in prior case law consistent with that definition); *see also Bass v. Board of County Commissioners, Orange County, Florida*, 242 F.3d 996, 1010 (11th Cir. 2001) (discussing meaning of "direct evidence" in the context of a Title VII race discrimination claim; "direct evidence" refers to a type of evidence which, if true, would require no inferential leap in order for a court to find discrimination.").

Here, plaintiff has presented only circumstantial evidence of racial discrimination.[9] "In

---

[9] Although Plaintiff admitted in her opposition to summary judgment that her case is based soley on circumstantial evidence, (Doc. # ), at oral argument Plaintiff claimed there is also direct evidence of discrimination in this case. Plaintiff pointed to two occurrences she claims constitute direct evidence: (1) Colvin's purported request for minority statistics on the same form requesting the BQL for the Birmingham position, (Doc. # 34, DEX 1, AR at E-26), and (2) a statement by Habersham's former employee, Jeannette Harmon, who allegedly overheard Habersham make negative comments about Plaintiff's performance. (Doc. # 46, PEX 12, Interrogatory Response of Jeannette Harmon from the Administrative Record, Report of Investigation, Tab J). The court does not find either of these instances to be "direct" evidence of discrimination. As for Colvin's alleged request for minority statistics, the law is clear that isolated events that bear no relation to the plaintiff are not direct evidence of discrimination. *Carter v. City of Miami*, 870 F.2d 578 (11th Cir.1989); *Burrell v. Board of Trustees of Georgia Military College*, 125 F.3d 1390, (11th Cir. 1997). Moreover, evidence that is subject to more than one interpretation or explanation, such as a request for information that may or may not be related to the decisional process itself, cannot constitute direct evidence. *Harris v. Shelby County Bd. of Educ.*, 99 F.3d 1078, 1083 n. 2 (11th Cir.1996). With respect to Habersham's alleged negative statements, Plaintiff mischaracterizes this evidence as "disparaging comments about the plaintiff behind the plaintiff's back, which were clearly interpreted by the hearer as racially motivated." (Doc. # 47, at 48). A quick reading of Harmon's statement reveals the situation was more benign than Plaintiff suggests: "while in the presence of the selecting official, Myrtle Habersham, I heard critical remarks of [Plaintiff] in the manner in which she behaved and conducted herself. It was very obvious based on Ms. Habersham's comments, that regardless of [Plaintiff's] abilities, she was not held in high regard, seemingly for reasons other than her qualifications." Habersham's alleged negative comments about Plaintiff, as substantively

evaluating [discrimination] claims supported by circumstantial evidence, [the courts of this circuit] use the now-familiar framework established by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)." *Combs*, 106 F.3d at 1527. Under the *McDonnell Douglas* and *Burdine* framework, the plaintiff first has the burden of establishing a prima facie case of discrimination, which creates a rebuttable presumption that the employer acted illegally. *See id.* at 1527-28. The methods of presenting a prima facie case, as well as the exact elements of the case, are not fixed; rather they are flexible and depend to a large degree upon the facts of the particular situation. *See, e.g., Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1185 (11th Cir. 1984); *Lincoln v. Board of Regents of Univ. Sys.*, 697 F.2d 928, 937 (11th Cir. 1983). In general, a plaintiff establishes a prima facie case of disparate treatment employment discrimination by showing that he or she was a qualified member of a protected class and was subjected to an adverse employment action but that otherwise similarly situated employees outside the plaintiff's class were treated dissimilarly.[10] *McDonnell Douglas*, 411 U.S. at 802 (hiring); *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997) (discipline); *see also Nix*, 738 F.2d at 1185 (discipline); *Pittman v. Hattiesburg Mun. Separate Sch. Dist.*, 644 F.2d 1071, 1074 (5th Cir. 1981) (wages).

Once the plaintiff has shown a prima facie case and, thereby, has raised the presumption of

---

articulated by Harmon, have nothing to do with race and are "devoid of any meaningful context." *Standard v. A.B.E.L., Inc.*, 161 F.3d 1318, 1329 (11th Cir. 1998). This is not a direct evidence case.

[10] *See also McDonnell Douglas*, 411 U.S. at 802 n. 13 ("The facts necessary will vary in Title VII cases, and the specification above of the prima facie proof required from respondent is not applicable in every respect in different factual situations.").

discrimination, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions.[11] *Combs*, 106 F.3d at 1528. The employer "need not persuade the court that it was actually motivated by the proffered reasons." *Burdine,* 450 U.S. at 254-55; *see Chapman*, 229 F.3d at 1024. If the employer satisfies that burden by articulating one or more such reasons, then the presumption of discrimination is dispersed and the burden of production again shifts to the plaintiff to offer evidence sufficient for a reasonable jury to conclude that the employer's supposedly legitimate reason is merely a pretext for illegal discrimination.[12] Where the defendant articulates multiple, reasonable, legitimate and nondiscriminatory reasons, plaintiff must rebut each of defendant's proffered reasons. *Chapman*, 229 F.3d at 1024-25. Although the prima facie case is irrelevant once the employer has offered a legitimate reason for its actions, the evidence of pretext may include the same evidence offered to establish the prima facie case. *Combs*, 106 F.3d at 1528.

Despite this shifting of the burden of production between the plaintiff and the defendant under the *McDonnell Douglas* and *Burdine* framework, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Burdine*, 450 U.S. at. 253. Given that the ultimate burden of persuasion always lies with the employee, a plaintiff may defeat a summary judgment by producing sufficient evidence to allow a rational trier of fact to disbelieve the employer's proffered legitimate reasons, thus permitting but not compelling the trier of fact to make a finding of illegal discrimination. *Reeves v. Sanderson*

---

[11] *See Chapman*, 229 F.3d at 1032 (A subjective reason is a legally sufficient, legitimate, nondiscriminatory reason if the defendant articulates a clear and reasonably specific factual basis upon which the employer based its subjective opinion.).

[12] If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it head on and rebut it. Simply quarreling with that reason is not sufficient. *Chapman*, 229 F.3d at 1030.

*Plumbing Prods. Inc.*, 120 S. Ct. 2097, 2108-09 (2000) (pointing out that the production of the necessary sufficient evidence by plaintiff will not always prevent the employer from prevailing on a Rule 50 motion and suggesting that the strength of plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other properly considered evidence that supports the employer's case are among other factors to take into account in evaluating a Rule 50 motion);[13] *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502 (1993); *Abel v. Dubberly*, 210 F.3d 1334, 1339 (11th Cir. 2000); *Alexander v. Fulton County*, 207 F.3d 1303, 1336 (11th Cir. 2000); *Combs*, 106 F.3d at 1529-38 (interpreting *Hicks* and the post-*Hicks* case law); *Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 920-21 (11th Cir. 1993). The court will address each of Plaintiff's claims separately.

A.    **Disparate Treatment**

In order to establish a prima facie case of disparate treatment in termination based on race, Plaintiff must show: (1) she is a member of a protected class; (2) she suffered an adverse job action; (3) her employer treated similarly-situated employees outside her classification more favorably; and (4) she was qualified to do the job. *See McDonnell Douglas Corp. v. Green*, 411 U.S. at 802, 93 S. Ct. at 1824; *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997) (citations omitted); and *Coutu v. Martin Cty. Bd. of Cty. Commissioners*, 47 F.3d 1068, 1073 (11th Cir. 1995).

The court need not consider whether Plaintiff has surpassed this hurdle, however, because Defendant concedes Plaintiff has presented a prima facie case of race discrimination under the *McDonnell Douglas* and *Burdine* standards set forth above. (Doc. # 34, at 20). The court will thus

---

[13] The court in *Chapman* modified the statement in Combs contrary to this holding in *Reeves* after noting that the standard for granting summary judgment mirrors the standard for judgment as a matter of law. *See Chapman*, 229 F.3d at 1025, n.11.

focus on the parties' respective arguments regarding whether SSA has articulated legitimate, non-discriminatory reasons for the selection of Dianne Washington and whether Plaintiff is able to present substantial evidence showing such reasons are pretextual.

### 1.    Defendant's Articulated Reasons

Defendant's articulated reason for selecting Washington over Plaintiff for the GS-15 reclassified position is that Defendant believed Washington to be more qualified for the position than any of the other candidates.  Habersham, the recommending official and *de facto* decisionmaker,[14] and McClure, one of the three panel interviewers,[15] selected Washington because, as the GS-14 PSC supervisor for ten years, she had displayed significant managerial and leadership skills, which they considered to be the most important criteria for the position at issue.  (Doc. # 34, DEX 3, McClure depo., at 78-79; DEX 2, Habersham depo., at 430-435).

Specifically, Habersham believed Washington had the leadership ability to integrate PSC, TSC, and field office operations; had demonstrated experience with a very active union; had experience in taking care of large, "big-picture" items; and had the ability to handle management problems in the Tampa and Ft. Lauderdale TSCs.  (Doc. # 34, DEX 2, Habersham depo., at 430-435).  Habersham testified that, although Plaintiff may have been capable of doing these things, she had seen Washington perform them successfully.  (*Id.,* at 448-449).  McClure felt that, while the

---

[14] There is no evidence that Colvin conducted her own independent analysis of the candidates above and beyond the recommendation from Habersham.  (Doc. # 34, DEX 5, Colvin depo., at 59-60, 64; DEX 2, Habersham depo., at 87; DEX 3, McClure depo., at 78-80; Complaint,¶ 25).

[15] As noted earlier, Wilson, the third member of the interview panel, denied he made a specific recommendation to Habersham.  (Doc. # 34, DEX 6, Wilson depo., at 78-79, 185-86).  Nevertheless, even he testified that he viewed general management ability as the overarching requirement of the job.  (Doc. # 34, DEX 6, Wilson Depo., at 78-79, 185-86).

Plaintiff was certainly qualified for the position and had more "hands-on" experience in the TSC than Washington, he was looking for general management skills and experience, and he felt that, considering that criteria, Washington was better qualified. (Doc. # 34, DEX 3, McClure depo., pg 204).

As the Eleventh Circuit noted, Defendant "need not persuade the court that [she] was actually motivated by the proffered reasons." *Burdine*, 450 U.S. at 254.  The court finds that Defendant has met her "exceedingly light" burden to articulate a nondiscriminatory reason for the adverse action. *Walker v. NationsBank*, 53 F.3d 1548, 1556 (11th Cir.1995).

### 2.   Plaintiff's Evidence of Pretext

In response, Plaintiff first claims the Defendant "cannot rest on the comparative qualifications of Washington as evidence of why the Plaintiff was not chosen for the [Director's] position" because Plaintiff believes Defendant did not *actually compare* the Plaintiff with Washington.  (Doc. # 47). Plaintiff relies on *IMPACT v. Firestone*, 893 F.2d 1189, 1193-1195 (11th Cir. 1990), for the proposition that "[i]ntroducing personnel records which *may* have indicated that the employer based its decision on one or more of the possible valid grounds d[oes] not suffice [to carry the defendant's burden of production]." *IMPACT*, 893 F.2d at 1194.  The court finds that the *IMPACT* analysis is not applicable to this case, however, because the undisputed evidence indicates that Defendant *did* compare the relative qualifications of Plaintiff and Washington.  Defendant not only compared and analyzed the applications of the twelve "Best Qualified List" employees, including Plaintiff and Washington, but Defendant actually interviewed all twelve applicants as well. (Doc. # 34, DEX 2, Habersham depo., at 87-89; DEX 3, McClure depo. at 148; DEX 6, Wilson depo. at 29). The undisputed testimony of the Habersham and McClure indicates they engaged in a *very specific*

18

comparison of the relative qualifications of Plaintiff and Washington. (Doc. # 34, DEX 3, McClure depo., at 78-79, 204; DEX 2, Habersham depo., at 430-435, 448-449). Accordingly, Plaintiff's reliance on *IMPACT* is misguided.

Plaintiff's next response is to disagree with Habersham's assessment of her qualifications; in Plaintiff's eyes she was more qualified for the position than Washington because she had been the GS-14 Mega- TSC Director for Birmingham since 1999 and had worked in the Birmingham Mega TSC for a number of years prior to the selection. (Docs. # 47, 57). Plaintiff essentially asks the court to engage in a *pro hac* comparison of the relative qualifications of the two candidates despite clear Eleventh Circuit law frowning upon such comparisons because they confuse honest but different evaluations of qualifications with intentional discrimination. *See e.g., Lee v. GTE Florida, Inc.,* 226 F.3d 1249, 1253-54 (11th Cir. 2000). "[F]ederal courts 'do not sit as a super-personnel department that reexamines an entity's business decisions.'" *Chapman,* 229 F.3d at 1030. Disparities in qualifications are not evidence of discriminatory intent unless they "are so apparent as virtually to jump off the page and slap you in the face." *Lee,* 226 F.3d at 1253-54.

This is not a "slap you in the face" case. In spite of *Plaintiff's* very high opinion of her qualifications, the evidence shows that *the decision-maker's* opinion of the relative qualifications was not unfounded. Washington had worked for the Agency the same period of time as the Plaintiff, but had been a GS-14 level supervisor much longer than the Plaintiff, albeit in PSC, not TSC.[16] Like Plaintiff, Washington had also received numerous awards from the Agency and was highly regarded

_____

[16] Although Plaintiff makes much of the fact that Washington had never worked in the TSC, that fact actually tends to support the Defendant's argument. Both Habersham and McClure testified they considered Washington's former PSC post to be more complex than the TSC branch. (Doc. # 34, DEX 2, Habersham depo., at 110-112; DEX 3, McClure depo., at194-195).

by her supervisors. Habersham testified that she felt Washington exhibited better general managerial skills than Plaintiff, which she regarded as more important than prior specific experience in the TSC. Moreover, Habersham testified that the ability to work with the union was a major criteria in her recommendation and that she believed Washington to be equipped to handle that relationship.[17]

Although Plaintiff disagrees with Defendant's subjective evaluation of her qualifications for the position, the Eleventh Circuit has made clear that "[a] subjective reason is a legally sufficient, legitimate, nondiscriminatory reason if the defendant articulates a clear and reasonably specific factual basis upon which it based its subjective opinion." *Chapman*, 229 F.3d at 1034 (citations omitted). In this case, Defendant has articulated specific reasons why she believed Washington to be more qualified for the position than the other candidates. Moreover, the Eleventh Circuit mandates that Defendants are to be afforded great discretion in the selection of management-level employees because such positions require responsibilities not fully measured by objective standards. *Chapman*, 229 F.3d at 1033-34. The court finds no evidence of pretext based on the relative qualifications of the Plaintiff and Washington.

Plaintiff next argues that Colvin's purported "checked box" request for minority statistics indicates the selection of Washington was based on race. Plaintiff's argument is without merit. First, Colvin denies requesting or using any such statistics for the selection of Washington. (Doc. # 34,

---

[17] In addition to highlighting Washington's union skills, Defendant also argues that Plaintiff did not get along with the union and that the union official had not liked Plaintiff "from the beginning." (Doc. # 34, DEX 4, Davis depo., at 129-131; 198). Plaintiff expends significant effort trying to demonstrate her relationship with union officials was not a factor working against her in the GS-15 selection. Notably, however, Plaintiff never claims that *Washington* did not work well with the union. Plaintiff simply believes that she was better equipped than Washington to handle any union problems. (Doc. # 46, PEX 1, Barrera Affidavit, at 2 ;PEX 2, Husson Affidavit, pg 3). Plaintiff's subjective opinion of her own qualifications is not relevant to this analysis. *See Chapman*, 229 F.3d at 1034.

DEX 5, Colvin depo., at 51-58). Plaintiff has not presented substantial evidence to dispute Colvin's testimony. Second, even assuming Colvin requested the minority statistics, Colvin was undisputedly removed from the details of the selection process, relying only on the Regional Commissioners to make recommendations for the positions. None of the officials involved with interviewing the candidates and reviewing their applications knew anything about a request for minority statistics, nor did they utilize such information in making their recommendations. (Doc. # 34, DEX 2, Habersham depo., at 413; DEX 3, McClure depo., at 124-135). Thus, as Defendant so aptly states, "[w]e are left with Plaintiff's mere naked speculation that such request might have been made for some invalid reason, even though there is no evidence that minority statistics were ever provided, what those statistics would have shown, or that such statistics were used in any way, much less an invalid or illegal way." (Doc. # 33, at 24-25). Such speculation is not sufficient evidence of pretext.

For these reasons, and because the court finds Plaintiff's other vague assertions to be baseless,[18] the court finds that Plaintiff has not adduced sufficient evidence to prove either "that intentional discrimination did indeed motivate the defendant or [] to allow a rational trier of fact to disbelieve the employer's proffered legitimate reasons." *Reeves v. Sanderson Plumbing Prods. Inc.*,

---

[18] Plaintiff's only other "evidence" of discrimination-that SSA's promotion selection process is invalid and discriminatory and that Habersham has exhibited a "pattern and practice" of discriminating against Plaintiff and other white employees-is without merit. Plaintiff's contention that Defendant is "offensively collaterally estopped from relitigating the issue of the validity of the Agency's promotion selection process" is based solely on the opinion of an Administrative Law Judge in the Southern District of New York in an unrelated case involving a different plaintiff and different decisionmakers. (Doc. # 47, at 50). This purported "evidence" involving different parties and different decisionmakers is not even relevant to the facts of this case, much less a basis for issue preclusion. Moreover, that Habersham's treatment of Plaintiff and other former employees was allegedly harsh at times does not demonstrate that Habersham's recommendation of Washington was pretextual. Plaintiff has not met the high standard for pattern and practice evidence as set forth by the Eleventh Circuit in *Hipp v. Liberty National Life Ins. Co.*, 252 F.3d 1208, 1227 (11th Cir. 1985) and *Maddox v. Claytor*, 764 F.2d 1539 (11th Cir. 1985).

120 S. Ct. 2097, 2108-09 (2000). Plaintiff's arguments center on her subjective self-evaluation and disagreement with Defendant's reasons for not selecting her for the position. This is not sufficient to withstand summary judgment. As the Eleventh Circuit stated, "[a] plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute his business judgment for that of the employer. Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." *Chapman*, 229 F.3d at1030. Summary judgment is due to be granted on the disparate treatment claim.

### B.    Retaliation

Plaintiff also claims that she suffered retaliation for filing a complaint of race discrimination with the SSA office of the Equal Employment Opportunity Commission. (Doc. # 1). To establish a prima facie case of retaliation under Title VII, Plaintiff must prove (1) she participated in an activity protected by Title VII; (2) *she suffered an adverse personnel action*; and (3) there is a causal link between the protected activity and the adverse employment action. *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1457 (11th Cir. 1998).

Plaintiff describes the Defendant's alleged retaliatory acts as follows: (1) Plaintiff was not invited to certain meetings with the Regional Commissioner, (2) Plaintiff was upset by an alleged conversation with Washington regarding the first "black-white upper management of the TSC;" (3) Plaintiff was not informed of issues concerning the Tampa and Ft. Lauderdale TSCs; (4) Plaintiff received an e-mail from Washington criticizing her for a decision she had made regarding office space, and (5) Washington did not defend Plaintiff in a dispute with union official Irene Jones and prevented her from participating in union discussions. (Docs. # 1, 46, 57). Plaintiff claims that

22

Washington's actions have prevented Plaintiff from assuming the full duties of Deputy Director, whom Plaintiff claims serves as the "alter ego" of the Director. (Doc. # 57). Plaintiff admits she has not lost any pay or benefits because of these alleged acts of retaliation, except that she has had to take "sick leave" because she was upset. (Doc. # 34, DEX 4, Davis depo., at 115, 118-119, 133-134).

The above described acts simply do not amount to an "adverse personnel action" cognizable under Title VII. Courts have uniformly held that to establish a prima facie case of discrimination or retaliation a plaintiff must establish, as part of her prima facie case, that she suffered an adverse employment action. *See Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 587 (11th Cir.2000); *Farley v. Nationwide Mut. Ins.*, 197 F.3d 1322, 1336 (11th Cir.1999); *Little v. United Technologies*, 103 F.3d 956, 959 (11th Cir.1997); *Doe v. Dekalb County Sch. Dist.*, 145 F.3d 1441, 1452 (11th Cir. 1998); *McCabe v. Sharrett*, 12 F.3d 1558, 1563 (11th Cir. 1994). To do so, Plaintiff must show a *serious and material change* in the terms, conditions or privileges of employment. *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1238 (11th Cir. 2001).[19]

The court finds that Plaintiff has failed to establish a prima facie case because she has not suffered a serious and material change in the terms or conditions of her employment. Summary judgment is therefore appropriate on Plaintiff's retaliation claim.

---

[19] As a Federal employee alleging workplace discrimination, Plaintiff must proceed under the waiver of sovereign immunity in 42 U.S.C. § 2000e-16, which provides that all "personnel actions" affecting federal employees or applicants for employment must be free from discrimination based on race, color, religion, sex or national origin. 42 U.S.C. § 2000e-16(a). In *Page v. Bolger*, 645 F.2d 227 (4th Cir. 1981) (en banc), the Fourth Circuit explained that the term "personnel action" contemplated "ultimate employment decisions such as hiring, granting leave, discharging, promoting, and compensation" and that "interlocutory or mediate decisions having no immediate effects upon employment conditions ... were not intended to fall within the direct proscriptions of [Title VII]." 645 F.2d at 233. The Eleventh Circuit adopted the *Page* reasoning and conclusion in *Ferguson v. Veterans Admin.*, 723 F.2d 871 (11th Cir. 1984). Essentially, the analysis required by *Page* and *Ferguson*, and the adverse employment action standard are the same.

## VI.   __Conclusion__

For the reasons stated above, Defendant's motion for summary judgment is due to be granted. (Doc. # 32). The court finds that no genuine issues of material fact remain for trial as to Plaintiff's two claims and that Plaintiff is entitled to judgment as a matter of law.  Defendant's motion to strike is due to be denied as it relates to the five affidavits submitted by Plaintiff and due to be granted as it relates to Plaintiff's expert report.  (Doc. # 49).  A separate Final Judgment will be entered.

**DONE** and **ORDERED** this ___5th___ day of April, 2004.

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE